Good morning. My name is James P. Kemp. I represent the plaintiff appellant Karen Gerving in this case. I think that the most important error by the district court in this case was to not do a mixed-modus analysis under 42 U.S.C. section 2000 E-2M. Particularly in this case, there should have been that analysis done by the district court. Ms. Gerving, at the very least, presented what I consider to be pretty compelling evidence that Mr. Gloucester, her supervisor, had a discriminatory bent toward her. And the court should have looked at the mixed-motives analysis and sent this through to the jury. It should not have granted summary judgment because there was evidence that there was at least this one illegal motivation on the part of Mr. Gloucester. Which was? Which was that he had told Ms. Gerving specifically, directly to her, that because she was a mother with children at home who had family responsibilities, that she could not perform that function and do the job that she had as a national salesman. That isn't exactly what he said. What's that? That is not exactly what he said. He thought it was interfering with her doing the job. Actually, Ms. Gerving's, and this is in her affidavit actually attached, the Nevada Equal Rights Commission narrative timeline that she prepared for them, specifically says, what he told her is, you cannot be a mother, you can't do a proper job being a mother and do this job. He had mentioned that when he hired her, that she had been single, and that when she married this man with small children whose mother had passed away and took over the caregiving responsibility for those children, to him that meant that she would not be able to devote the kind of time that was required to do the travel that was required. And he indicated that her place was at home with those children. That's specifically what he told her. That shows and evinces a discriminatory intent. Well, apparently, though, if I know that you're discouraging this court from doing the McDonnell-Douglas shifting test and saying that you've submitted adequate direct testimony to bypass that, but assuming that's not the case, there is evidence in the record of her having performance issues. And arguably, too, you know, I mean, let's say if, in fact, I mean, arguably, if a person was away from work so much that they couldn't perform the essential functions of their work, regardless of what the reason was, that, you know, it might not be, you know, say, for example, if a job does require travel, and then you can no longer travel, does that mean that you're being discriminated against because you don't do that? Well, in this particular case, Ms. Gerving was capable of traveling. She was capable of doing everything that her job required. Nothing, from her perspective, nothing changed simply because she married a man and now had caregiving responsibilities for three children. So I think that from her perspective and her position is that that was not the case, that she was still capable of doing the job. And also, you know, if we get into the McDonnell-Douglas burden shifting, I think there's a question of fact as to the legitimate reason that's been proffered by Mr. Louster, and he's the primary source of all of the negative information about Ms. Gerving. He's the one that's been putting forth this idea that she's just such a horrible employee. He's the primary source of the negative employment reviews, and he's also the primary discriminator. So I think you have to look at that. He's got a bias, and that's reflective in the negative view that he has of Ms. Gerving. Well, honestly, I'll tell you where I have a question is on the retaliation. And I'm going to ask the other side, and you might want to comment on this exactly, what retaliation is perhaps one of the broadest areas right now, and the Supreme Court has come up with cases that look to define it quite broadly. And it would appear that the district court here seemed to say that she didn't engage in protected behavior and faulted her for not producing corroborating evidence, and also found that there was a lapse between the temporal proximity, or that, you know, tying together that she was fired for this. And obviously at the stage of summary judgment, all inferences go in favor of the plaintiff. And what there does seem to be some dispute as to how many times she talked to people and complained about Mr. What was his name with an L? Louster. Louster. Yes. Not a good name. But the Mr. Louster. But you did make a cite to the record, and it does appear that there is evidence in the record that she complained about him at some point. And following that, there is evidence in the record that there may be disputes as to how many times. I think she says four, but there is evidence in the record of other, and she does have a friend that remembers something about this. And also Mr. Louster acknowledges that there is evidence in the record that he was angry that she disclosed what he considered to be a private conversation, which, you know, if you commit a discriminatory act, I don't know, you know, I mean, arguably, you know, say, for example, if you groped someone in the privacy of your office and then they complained about it, they said, well, I thought it was private. I don't think that holds a lot of water. But that being the case, then he did admit that he wanted to fire her right away. But then apparently there is a change of administration which delays her firing. So, you know, that's the area that I have the most questioning. Yes, it's seven months, and if it were seven months without him trying to fire her, that makes a stronger case for summary judgment in terms of as far as this goes. But that's the area that I've got the most question. The temporal proximity? Well, you know, I mean, I think that's your strongest argument. Frankly, I don't think that – I do think that McDonnell Douglas has to apply in this situation, and I'm just not sure under the circumstances. Your client does have – they did satisfy that they had reasons that she did have, and I'm not sure that she said it was protectoral. But it does seem to me that there's a kernel there on retaliation. Well, yes. And I think I'm arguing it better than you are arguing it. I think you are, Judge. With regard to pretext, because I would like to speak about that, I think that there is evidence of pretext because the reasons that are proffered by the Aladdin for her termination at the time in March 2005 are not worthy of credence. We have the letters that were known based on the affidavit of Geraldine Sandman and also Karen's own discussion with Jim Loster. These letters were known to be aimed at securing financial concessions from the Aladdin. They made complaints about several different departments at the Aladdin, not just Karen. Remember, these letters were almost a month before they fired her. So you're going to talk about temporal proximity. If you got letters like that and you were going to do something about it, you would suspend somebody right away and investigate it. You wouldn't wait a month later. I think that creates a question of fact because a jury could look at that and say, well, Ms. Sandman says that these were not important issues, that Mr. Loster recognized this as just the customers trying to maneuver themselves into cutting a better deal for themselves on their attrition penalties. And also we have the situation with Leah Abbs, which was this discussion that took place at Karen's cubicle, where they had what they both admit was a misunderstanding and a little bit of a heated exchange that doesn't seem to be anything out of the ordinary in the workplace at the Aladdin. I mean, Mr. Loster himself testified that he used the same kind of profanity. Ms. Robinson testified that Mr. Loster had yelled at her on occasions. And Mr. Loster ---- What about the complaints of the customers? The complaints of the customers, because we have the testimony of Tara Wolf, who was a coworker, who was also a national sales manager, who said that it was not uncommon to get these written complaints from customers. She said it wasn't uncommon to get two complaints a month. This was something that was expected. We have Ms. Robinson, the supervisor's testimony, that they weren't always able to get back to the customers in a timely manner. They were getting, according to Ms. Wolf, as many as 50 leads a day. They were supposed to respond to these within 48 hours, and it was just a task, a feat. I think she referred to it as a feat that nobody could complete all the time. So there were some customer complaints. The point is that people don't get fired for those. Nobody at the Aladdin really gets fired for these customer complaints, and that's what Ms. Robinson testified to, that these kind of performance issues, because nobody's perfect, and she says there's a lot of variables, and you look at what took place. You combine that with the fact that Mr. Louster has this discriminatory bent toward Karen Gerving, and this creates a genuine issue of fact that should be left to a jury, to the trier of fact to determine. Ms. Robinson also participated in the evaluation. Did she not? Well, there's a dispute as to that, because Ms. Gerving, in her affidavit, in her narrative timeline, when she spoke to Ms. Robinson immediately after getting the July 15th document, which for some reason was withheld from her for two weeks, she didn't get it until the end of July, she went to talk to Ms. Robinson. Ms. Robinson told her that she hadn't seen it, that she just, you know, Mr. Louster gave it to her here, signed this. She signed and dated it on the 15th of July and gave it back to him before it was completely filled out. Ms. Robinson, frankly, at her deposition, she didn't remember a whole lot. She said she'd blocked a lot of that out. Tara Wolf said she'd blocked a lot of things out about working at the Aladdin as well. But according to what Ms. Gerving was told by Ms. Robinson at the time is that Ms. Robinson had signed this and given it back to Mr. Louster with respect to that document, which is the worst, you know, the worst document that exists with regard to what Mr. Louster was saying. Do you want to save some time for rebuttal? I would. I'll reserve the balance of my time. Thank you. Okay. Thank you. Good morning, Your Honors. Joanna Kishner of DLA Piper on behalf of Appellee Op-Biz. I have problems with the retaliation part of this. Sure. I can address that first if you'd like, Your Honor. Well, in order to have retaliation, you need to have a couple of things, as the Court is fully aware. And one of the main issues, as the Court brought up, is the fact there has to be some causation before some protected act. And I think the Court had some concern on whether or not there was a protected act. The Court found there wasn't. It wasn't a protected act. But the question in terms of how the U.S. Supreme Court has been dealing with retaliation clauses, it seems that there is evidence in the record that she complained about her supervisor, that he said you can't be a manager, you can't do this job and have kids and do all of that, and that he's upset with her after that. And then he tries to fire her. So why isn't the Colonel, you know, you don't need a lot. And it seems clear to me that that's protected activity. The district court, I think, got that wrong. Then on the temporal, it's true, seven months would be long. But here you have interjected in this, it's basically undisputed, that he tried to fire her right after he was stopped from doing it and then fired her later. I think the problem here is a couple of things, Your Honor, is that Jim Lallister does not run what's the Aladdin at the time, okay? He is a mere vice president of one department. And as he specifically testified throughout his deposition, and I think he even used the phrase it's very hard to fire someone here, is that he could make a recommendation regarding what he thought was appropriate course of disciplinary action. And one thing I do want to clarify. Let's break it down. Is that protected activity when you go complain about someone and you say that, you know, he said either, you know, I've got to be a mom or I've got to be a manager, I can't do both, and you're talking to human resources, is that protected activity? I don't think the scenario Your Honor has raised is the scenario that happened in this particular case. I think that there are some distinguishing facts that would make it, in this case, not protected activity, or at least very close. The way that I describe it, would it be protected activity? Going to complain to human resources about comments that someone made to you about your job performance that you think are inappropriate, is that protected activity? I think if you made it clear that it was a reasonable person in human resources position would understand that the comments and the concern here is that you were being treated differently because of a protected category, then yes, I don't. But that, okay, so then you're saying that's an objective, that the person in human resources has to, a reasonable human resources person has to understand it, even if. I think there's a difference, Your Honor. I think we need to go back a step here. I think it was clear that Mr. Louster said, and you have to look, counsel referred to the NERC statement. That's after Ms. Gerving already has an attorney. I think you have to go back in the record further, because you'll see that there's a very clear change in how she perceives things and how she prints it out in her various documents. If you go back to the record at 265, you'll see her initial concerns she brought forth. And then if you also look at 324, which is even her typed written version, a month after she had gotten the performance appraisal on her, about August 24th. Okay? If you look there, either of those places, you will see that taking the facts to the benefit of plaintiff, Ms. Gerving, that she says that Mr. Louster said that he had said these conversations in private and as a friend. Your example of the groping is different than it is here. All right, but the court said she needed corroboration. If I went into human resources and I said, you know, I complained of a discriminatory act, would a court be able to, for purposes of summary judgment, can you cite me any case that would require that that would have corroboration? Why that wouldn't be a material fact? The scenarios you raised, Your Honor, I would concur, but I don't think that's a scenario. See, all I'm hearing here is why you might win on a retaliation charge at trial, not why this shouldn't survive summary judgment. So that's where you need to focus, not why you might win. Yes, Your Honor. With regards to the retaliation, the court did find the underlying, did not find a prima facie, and then the pretext. But here we have a legitimate nondiscriminatory reason. Calm down in your speech. Sure. I think you'll be more effective. With regards to the retaliation claim, I think the temporal proximity does make a difference here, Your Honor, because the temporal proximity is not just seven months. And there is sufficient Ninth Circuit case law in Breeden, Villarmo, et cetera, where the temporal proximity has been an issue, okay? And even as short as three months as courts have held, that temporal proximity between the alleged protected activity and the action is sufficient. But here you not only have a time period of seven months. You have the testimony of Mr. Louster that says after this final coaching in August, Ms. Gerving's performance improved somewhat, and then it went downhill again, okay? So you have the purported alleged discriminator, and once again, he's only one of several people that had to approve the decision. You also have the neutral third-party letters. Now, counsel has brought up what happened between the letters that came in on or about February 18th and when the termination actually took place a month later. As Mr. Louster testified, and it's undisputed, he investigated to see if the very concerns that counsel has raised were true. And as this court is aware, the employer doesn't necessarily have to find the truth of that. Okay, so at a trial he would argue that, yeah, I wanted to fire her in August, but then she did better, and then there were other people that did that. And so when she finally got fired seven months later, it was really because of her performance. I got a get pass from, at summary judgment, you have her complaining about comments that he made to Human Resources. You have he's mad because she complained and thought that they were having a private conversation. You have he definitely wanted to fire her in August, but he was told that he couldn't. Then you have her fired seven months later. Does that the question is, is that enough to get past summary judgment? I think it's not, Your Honor. I think that the record was very clear. Okay, give me some cases that were on point that would tell me. I mean, the cases that, you know, some of them that you cite where they take time don't necessarily have where the person did try to fire the person before. Your Honor raises a very good question, because if you look, I mean, you have to look also the fact that here you had a total change in ownership. You had a new set of Human Resources individuals, new upper management that came in, that looked before this termination decision took place, okay? Do we have Mr. Lauper completely out of the picture? Mr. Louster, I'm sorry. Mr. Louster, do we have him completely out of the picture? No, he's not completely out of the picture because he is still the indirect supervisor. But one of the issues here is that Ms. Robinson was the one who brought up most of these claims and most of these issues. It was her memos to Mr. Louster that brought forth the various issues regarding Ms. Gerving's performance. It's undisputed that these letters came forward, okay, the letters from CLT and the letter from Mature Health. It's undisputed that she did have the argument with Leah Abbs. Now, court may – counsel may try and isolate those and say each one of those in and of itself may not be enough, but I think that when you're looking at the independent evidence combined, which is what the lower court did and I think this Court should do as well, is that you have clearly a history of performance issues consistently throughout her whole tenure of performance – her tenure of employment. You also have it predating. When she was worked, she got fired from the Venetian and pretty much got fired from the MGM, although she – Am I weighing the evidence, though, there? No, Your Honor. I'm not asking that you weigh the evidence. I'm not asking for credibility.  regardless of – If I make a – if I ascertain credibility, am I not weighing evidence? How do you ascertain credibility without weighing evidence? I mean, I was a trial judge, you know, and I didn't – I fully – You know, I didn't determine credibility without weighing evidence. Okay. Your Honor, there still is the plaintiff's burden, and the plaintiff's burden here is to establish pretext on the McDonnell-Douglas standard in both the discriminatory and the retaliation claim. And with respect to the retaliation claim, what the Court has asked me to focus on, the fact that there is this temporal proximity does make a difference. The fact that you have a new set of human resources professionals who had no buy-in to the earlier issues, they independently reviewed the full issues regarding Ms. Gervin's employment and determined whether or not it would be appropriate to – Are you saying Mr. Lobster had no role whatsoever in her termination? No, Your Honor. I'm not suggesting he had no role whatsoever. I'm talking about human resources. The cause does not have to be but for, as long as he's a substantial factor in causing. I think it's the substantial factor, Your Honor, that I'm addressing. I think that before anyone can be terminated, they have to go through human resources. And human resources does an independent evaluation of whether or not the employment termination or whether it be demotion or whether it be a failure to provide bonus. Okay. So there you have an independent actor. Now, you don't have a complete independent third party brought out from the outside that's evaluating the situation. But you have people that are experienced human resources professionals who are not involved in the underlying claims. And so they could look at the entire record, evaluate whether or not this was an appropriate action, and they actually effectuate the termination. A termination, a recommendation regarding a specific employment action, occurs from a department head. And then the human resources makes that determination of whether or not the actual action should take place. And that's what happened here as well. You also have Bill Feather, who's the Vice President of Hotel Operations. Once again, he's not anywhere in the picture with any of these alleged claims. He also has to approve it. Well, would you concede the fact that, you know, and the Supreme Court is defining retaliation very broadly, and that frequently where a plaintiff can't show discrimination, there still can be a retaliation clause. And so, I mean, I think in advising employers, a lot of times they're on very solid base in terms of but for, that there's something in there that creates that kernel for retaliation. And they might win at trial, but, you know, I mean, I'm here, what I'm struggling with, I'm not sure that she, I'm not, I would say that you have a strong argument that she hasn't, that she shouldn't prevail on the discrimination. You have a less strong argument on the retaliation, because of things that Mr. Louster did. But, Your Honor, I. And not that, you know, that you may very well have a very low performer here that has a lot of problems with it. But sometimes employees do things that put human resources in a bind. And, Your Honor, I can appreciate that. But at the same time, what you have here is you do have independent customers. I mean, you have come to the effect that this is the worst person I've dealt with. Karen Gerving should not be a person who deals with customers. She threatened, according to one of the letters, to go to Florida to track somebody down. Regardless of what viewpoints, Bill Feather got those letters. Bill Feather could not. This was a start. Now, the corporate ownership issue flies into it again, because Bill Feather is coming from the Starwood side of things. And these are established Starwood clients. That may be why you win at trial. But at the same time, Your Honor, the pretext argument, she can't show anything to rebut the legitimate nondiscriminatory reason under McDonnell-Douglas. Under a mixed motive analysis, I understand the Court would say, well, is this a motivating factor or is this a substantial factor? But I don't think that Louster – the Court is kind of assuming that there was this animus and that there was this discriminatory protected activity. And I appreciate Your Honor's position on that. I don't think it's necessarily as clear, because I think when – Well, no, I mean, we're not assuming, but we have to take all inferences in favor of the plaintiff for summary judgment. And that's not a credibility determination. They get all inferences. They get all inferences, Your Honor, but there still has to be proof that there is a discriminatory animus. And animus is – in many terms, you're pretty much trying to get into the head of another person. You're trying to show that Mr. Louster had this animus. And in reality, that's not going to be. What's wrong with this single piece of evidence of direct discriminatory animus? Mr. Louster told Ms. Irving her daughters needed her at home. ER 14. What business is it of Mr. Louster to use that as a basis of employment? Isn't that just enough to show discriminatory animus? As a reasonable jury that heard that testimony was properly instructed and heard no other could make a determination of gender animus, could they not? To which you add the evidence that Louster refused a 30-day extension to Ms. Madrid, the sales assistant, to which you add that Louster told the pregnant Ms. Tejon her children needed her at home, discriminatory of his attitude, which may be very prevalent that women should take care of their children at home. But that, as far as I can see, is gender discrimination. Your Honor, I think we had an issue, actually. Ms. Tejon was never disclosed, was never a witness. Those are hearsay. Speak out a little bit more. Sure. Your Honor, I said Ms. Tejon was never disclosed even as a witness. We raised that issue. She was never brought forth as a witness in initial disclosures. So her testimony would not have even been appropriate. Ms. Madrid is an affidavit that was attached to the opposition to the motion for summary judgment. We feel it should have been stricken. You think they have to disclose who's going to declare before the declaration can be filed? I think you have to give the opposing side an opportunity to know what the general witnesses are. But there's no trial yet. Okay. We won't discuss that. You've got 22 seconds. I have a question. I'm going back a little bit. The district judge had found that, had determined that the human resources had indicated that no official complaint had been made, so she therefore failed to show that it was protected activity. Isn't that a sound basis for finding there was no protected activity? Yes, Your Honor. That was part of what I was heading towards is Tracy Gwinnick, who was then Tracy Sapien, also known as Tracy Gwinnick. She changed her name during the course of the litigation. So she references both. I understand what you're saying. Sure. Tracy Gwinnick, who's also known as Tracy Sapien in the record because her name changed during the course of the litigation, clearly testified in her deposition that at the time that the issues were brought forward, she did a full investigation. Because the timing of Ms. Gerving for the first time raising this issue with Mr. Louster occurred almost a month after she received the performance appraisal. Once again, the performance appraisal agreed upon between both Maureen Robinson, undisputed, and Jim Louster. But what happened is Ms. Gerving went on vacation. She comes back from vacation, undisputed, and she finds out that Mr. Louster has been coordinating with Human Resources regarding her performance issues. So then Ms. Gerving goes to Stacey Breand, who's the number two in Human Resources at that time, and she says that she has brought forth this issue regarding Mr. Louster at the time, and at no point did she ever consider it or call it discrimination. Now, the court may very well say that experienced Human Resources should have taken that as discrimination, but they fully investigated, Your Honor, as Ms. Gwinnick testified in her deposition, and found that they thought that Ms. Gerving was basically disgruntled about her performance appraisal. The nature of the conversation Do you have to file an EEO complaint to engage in protected activity? Of course not, Your Honor, and I'm not suggesting that. What I am suggesting, though, is that in order to do an investigation, you have to base it on your conversations with the person who brings forth the concern and the nature of the concern that they bring forth. The fact that they were doing an investigation would indicate that she filed something. They fully investigated to ascertain what were the issues here, because once again, as Human Resources professionals, they wanted to determine were there performance issues that needed appropriate counseling, coaching, which is what ended up resulting after their a final coaching document or a final counseling document can be referred to as either. Did Human Resources or not maintain, as the district judge found, that she had not filed any kind of a formal complaint? That's correct. Undisputed Tracy Gwinnick's deposition testimony that's in the record. All right. That's what I was asking. Yes, Your Honor. Okay. I think you're actually in overtime, but we kept you there. So that will conclude your comments, and if you have any rebuttal, we'll hear from an appellant's lawyer. Thank you, Your Honor. I think what's clear is that the facts are just really in dispute. I think it really requires a trial to sort out everything that happened. Well, how about the fact of whether any complaint was filed? The district judge said that Human Resources said there was no complaint. And respectfully, I believe that the district court judge was mistaken about that, because Ms. Gerving did go to the Human Resources Department on the 12th of August, all right, and she did make a complaint about it there. She spoke with Stacey Briand. Her notes, Ms. Briand's notes are in the record where she did go, and she told Ms. Briand, look, this guy told me I can't be a mother and work here at the same time. He's talking about my family responsibilities. He's basically getting into an area where I'm not comfortable with this, and I believe that it's wrong. So that would be protected activity. But there's also another issue of protected activity. The day after Mr. Loster said these things to her, she spoke with her coworker, Tara Wolf, and showed or she spoke with Tara Wolf about her review and about the meeting that she'd had with Mr. Loster and what Mr. Loster had said about her children. And Mr. Loster found out about this and actually went to Karen and chastised her about discussing what Mr. Loster had said about her having her family responsibilities with Ms. Wolf. And there are notes, it's in the excerpts of record toward the end, the excerpts of record that were provided. The fact that you mentioned it to a co-employee doesn't do it, does it? I'm sorry? The fact that she mentioned it to a co-employee doesn't mean there was protected activity, does it? Well, I think that it is protected activity. She's allowed to discuss concerns in the workplace with her coworkers. And when Mr. Loster finds out about that and chastises her and basically told her on that day, no, look, I'm going to try and find a way to have you out of here by the end of the day. And that was on August 3rd. And that is also in Ms. Curving's narrative account that she provided to the Nevada Equal Rights Commission. So she didn't have to file anything with human resources at all, just contact with a co-employee? In point of fact, she did do that on both the 12th of August and the 24th. She was interviewed by Stacey Briand on the 12th, and she provided a narrative of what Mr. Loster had said to her on the 24th in response to that. Those two dates, and I was aware of that, was that raised for the district judge when he made his finding? Well, it was part of Ms. Curving's affidavit, and it was definitely in the record that was before the district court judge. I don't remember specifically if it was in my brief before the district court judge or not. I believe that it was, because the whole point of this is that she did go to human resources. That is the protected activity that she engaged in. Not just a co-employee? Not just a co-employee, but also the human resources person who was assigned basically. That's the protected activity that you're talking about. Well, yeah, I believe that they both are, but you're right, Your Honor. You think that just going to a co-employee makes it a protected activity? Well, I think having that discussion with a co-employee would be, but you're right. I mean, the stronger he is going to human resources, of course, Your Honor, absolutely. And one other thing, the seven-month period, page 26 of the record, Mr. Loster had a conversation with Karen Gerving in September where he was having to fight to keep his own job with Starwood at that point. And that's part of the reason that it took him so long to finally effect her termination, and that would explain part of the seven-month time frame. All right. Well, you're in overtime, and I think that we have both of the, I think from both perspectives, you've both articulated them well, and we have the issues well in mind. So that will conclude oral argument for the day. This matter stands submitted, and we're in recess until tomorrow morning at 930. Thank you.
judges: Hug, Callahan, Bea